## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MONTANA

In re

**BRADLY JACOB SILVONEN** and
**CARISSA RENAE SILVONEN**,

Case No. **10-60224-7**

Debtors.

---

**JEFFERY A. WALKER**,

Plaintiff.

-vs-

Adv No. **10-00050**
Consolidated with

**BRADLEY JACOB SILVONEN**,

Defendant.

---

**DON HUNTER**,

Plaintiff.

-vs-

Adv No. **10-00075**

**BRADLEY JACOB SILVONEN**,

Defendant.

## MEMORANDUM of DECISION

At Butte in said District this 14th day of July, 2011.

In the above consolidated Adversary Proceedings, after due notice, the Court held a trial

on May 26, 2011, in Butte.  Debtor/Defendant Bradley Jacob Silvonen was represented at trial by

1

Gregory W. Duncan of Helena, Montana; Plaintiff Jeffery A. Walker ("Walker") appeared pro se; and Plaintiff Don Hunter ("Hunter") was represented at trial by Thomas A. Budewitz of Helena, Montana.  Hunter's Exhibits 1 through 33 and 35 through 44, Debtor's Exhibits A through V, and Walker's Exhibits 1 through 4 were admitted into evidence without objection.  At the conclusion of the trial, the Court took the matter under advisement.  The matter is ready for decision.  This Memorandum of Decision includes the Court's findings of fact and conclusions of law.

## BACKGROUND

Hunter completed high school and has been a construction superintendent for the past 35 years.  Hunter has been employed by Greenway Enterprises of Helena, Montana, for the last 16 or so years, building and renovating American embassies around the world.  Hunter retired in 2008 and now lives part of the year in Montana City, Montana.

Walker also worked for Greenway Enterprises in 2000 or 2001.  Hunter and Walker first met during that time.  In early 2008, Hunter and Walker had a chance meeting and while visiting, Walker told Hunter about a possible new business venture Walker was contemplating with a friend, Bradly Silvonen ("Silvonen").  Walker explained how he and Silvonen were thinking of opening a used car lot.  The conversation eventually turned to whether Hunter would have any interest in investing in Walker and Silvonen's used car business.  Hunter said he would consider the proposal if Walker and Silvonen were agreeable to granting Hunter a security interest to protect his investment.

Following the chance meeting between Walker and Hunter in early 2008, Walker telephoned Hunter and asked if Hunter would meet with Walker and Silvonen.  Hunter agreed.

2

The three met at Blue Star Autos, the car lot where Walker and Silvonen were then employed. At that time, Walker and Silvonen explained that they would like Hunter to provide the financing for their new business venture because then, Walker and Silvonen would not have to go through the hassle of securing conventional financing. Hunter told Walker and Silvonen that any deal they reached had to be on the "up and up," that the deal had to be secured, and that Hunter would not do the deal on a handshake.

After about three meetings, Hunter, Silvonen and Walker reached the basic structure of an agreement whereby Hunter would provide financing for Silvonen and Walker's used car business. Hunter agreed to invest $100,000 with Walker and Silvonen so Walker and Silvonen, through Integrity Motors, LLC, could purchase cars. The parties agreed that Hunter's investment would be secured by cars with a combined value of at least $144,000. Walker and Silvonen further assured Hunter that Hunter would be their sole source of financing.

On or about July 9, 2008, Silvonen created Exhibit 3, an Operating Agreement for Integrity Motors, LLC. Silvonen told Hunter that Silvonen's accountant had prepared Exhibit 3. However, Silvonen testified that he prepared Exhibit 3 from documents he obtained online.

The Operating Agreement, dated July 9, 2008, is signed by Silvonen, Walker and Hunter. The Operating Agreement reflects that Silvonen and Walker are each 50% owners of Integrity Motors, LLC, and that each was investing $35,000 plus "sweat equity" into Integrity Motors. Consistent with the terms of the Operating Agreement, Walker and Silvonen assured Hunter that they were each putting $35,000 into Integrity Motors, LLC. Hunter testified he required that Walker and Silvonen each invest $35,000 into Integrity Motors so it would have adequate operating cash.

3

The Operating Agreement at Exhibit 3 identifies Hunter as a limited partner with an investment of $100,000.  Hunter, Silvonen and Walker agree that Hunter did not want an ownership interest in Integrity Motors.  Rather, Hunter wanted a guaranteed return on his $100,000 investment in Integrity Motors.  Consistent with Exhibit 3, Silvonen filed Articles of Organization with the State of Montana on July 9, 2008, identifying himself, Walker and Hunter as members or managers of Integrity Motors.

Exhibit 4 is a July 9, 2008, "Addendum to Integrity Motors LLC operating agreement." The Addendum is signed by Walker, Silvonen and Hunter.  The Addendum describes how Hunter would receive repayment of his $100,000 investment.  Exhibit 4 provides that "Hunter[']s contribution is to be secured by Integrity Motors inventory."  According to Exhibit 4, Hunter's compensation or profit was identified as follows: "Hunter is to receive $165.00 per retail unit sold regardless of profit or loss.  Don Hunter[']s compensation is to be $18,000 at the minimum per calendar year regardless of profit or loss."  Exhibit 4 reflects that Hunter's "contribution [would] be used in full for the purchase of inventory" and further provided that Hunter could not withdraw his investment for at least one year from July 9, 2008, and after that, if Hunter wanted to withdraw his investment, Integrity Motors would have 90 days to repay the investment in full.

Consistent with the agreement reflected in Exhibits 3 and 4, Hunter made his first $50,000 investment in Integrity Motors on or about July 16, 2008.  The evidence reflects that Hunter's $50,000 was the initial deposit in Integrity Motors' checking account.  No other deposits were made into Integrity Motors' account in July of 2008.

Hunter made a second $50,000 contribution to Integrity Motors on August 8, 2008, but requested an immediate refund of the second $50,000 payment because Hunter felt Integrity

4

Motors had not yet purchased an adequate number of cars to protect Hunter's investment.  At Hunter's request, Silvonen refunded Hunter's second payment of $50,000 on August 12, 2008.  Silvonen conceded that Integrity Motors probably had only 5 or 6 cars on its lot when Hunter requested a refund of his second $50,000 payment.

Hunter explained that after Integrity Motors got more cars on its lot, Hunter again tendered a check in the amount of $50,000 to Integrity Motors on August 19, 2008.  As of August 19, 2008, Hunter had invested $100,000 in Integrity Motors as agreed.

In addition to the original investment of $100,000, Hunter later invested another $25,000 in Integrity Motors in November of 2008.  Hunter explained that Silvonen was wanting to purchase some larger "gas guzzling" vehicles that were, because of high gas prices, being sold at auction at deep discounts.  Silvonen requested an additional $35,000 from Hunter for the purchase of larger vehicles.  Hunter agreed to invest an additional $25,000.

Until the spring of 2009, Hunter believed that business at Integrity Motors was going along fine.  Integrity Motors was buying and selling cars, and making its contemplated payments to Hunter.  Exhibit 36 summarizes the payments Integrity Motors made to Hunter.  Between August 5, 2008 and April 5, 2009, Integrity Motors paid Hunter $19,321.54 on his $125,000 investment.  Hunter was thus surprised when he received a call from Walker in April of 2009, advising that Integrity Motors' flooring company was removing cars from Integrity Motors' lot.  Walker also informed Hunter at or about this same time that Silvonen had attempted to obtain credit cards in Hunter's name, but that fortunately, the credit applications had been rejected.  Exhibits 17, 18 and 19 are letters dated April 27, 2009, May 6, 2009, and May 6, 2009, from credit card companies regarding requests to obtain credit cards.  Two of the letters were sent to

5

Hunter at Integrity Motors' business address.  Silvonen admits that he submitted the credit card applications, but contends he did so with Hunter's knowledge.  Hunter denies that he gave Silvonen authority to submit the applications, testifying that he had no knowledge of the credit card submissions until they were brought to his attention by Walker.

During the period of time leading up to execution of the July 9, 2008, Operating Agreement and Addendum, Silvonen and Walker assured Hunter that he would be the sole source of financing for Integrity Motors.  As stated above, the parties also agreed that Hunter's investment would be secured by inventory with a value of at least $144,000.  Hunter did not have any experience perfecting security interests and relied on Walker and Silvonen's expertise in the car business to take the steps necessary to perfect Hunter's security interest.

Upon learning the sobering fact that he was not the sole source of Integrity Motors' financing, Hunter  requested return of his investment.  Silvonen first wrote Hunter a check in the amount of $80,000 but post-dated the check to June 30, 2009.  Even though cars were being removed from Integrity Motors' car lot, Silvonen told Hunter not to worry because Silvonen had an interest in his grandmother's home in the Big Hole that was worth $700,000.  Silvonen told Hunter that Silvonen and his grandmother were selling the home and that upon its sale, Silvonen would have sufficient cash to repay Hunter in full.  In a strange turn of events, Silvonen's grandmother telephoned Hunter sometime during the early summer of 2009.  During their conversation, Silvonen's grandmother told Hunter that Silvonen had no ownership interest in her Big Hole home and in fact, that Silvonen had written his grandmother a check that was not honored because of insufficient funds.

Hunter was very distraught after his discussion with Silvonen's grandmother.  In an effort

6

to pacify Hunter, Silvonen wrote Hunter another check on June 29, 2009 in the amount of $40,000. Silvonen told Hunter he could take the $40,000 to the bank because Silvonen had just received money from his dad. When Hunter attempted to cash the $40,000 check, it was refused because of insufficient funds. Hunter then attempted to deposit the $80,000 check that Silvonen had written to Hunter earlier, and it too was refused because of insufficient funds.

Given the events that were taking place in April of 2009, it was apparent to Hunter that he was not, contrary to what he previously believed, Integrity Motors' sole source of financing. Hunter also learned that his investment was not protected by $144,000 worth of inventory as promised. Integrity Motors' business was eventually wound up and after the secured lender or lenders had repossessed their collateral, Integrity Motors was left with approximately 10 vehicles, 3 of which were on consignment. Silvonen explained that inventory dwindled to nothing and in the end, Integrity Motors had about two vehicles that in Silvonen's opinion were worth a combined $1,000 at most. The evidence shows that Integrity Motors had only a few vehicles on its lot when the business was dissolved that were not subject to the security interest of other lenders.

While Hunter believed until the summer of 2009 that his investment was secured by vehicles with a value of at least $144,000 and that Integrity Motors was governed by the operating agreement he signed on July 9, 2008, the evidence shows that Hunter's investment was not secured. The evidence also shows that Integrity Motors was actually governed by a second Operating Agreement, also dated July 9, 2008, that was signed only by Silvonen and Walker. Although Exhibit 2 bears a date of July 9, 2008, Silvonen testified that he could not recall when Exhibit 2 was drafted or signed. The Operating Agreement in Exhibit 2 has Walker contributing

7

"sweat equity" to Integrity Motors, LLC for a 5% ownership interest while Silvonen was contributing $150,000 for a 95% ownership interest in Integrity Motors. Silvonen concedes that Hunter was not aware of the Operating Agreement shown in Exhibit 2.

Consistent with the ownership structure reflected in the Operating Agreement between Silvonen and Walker, Exhibit 2, Silvonen and Walker executed a change in ownership addendum on September 24, 2008, wherein Walker, "acting as a 5% member of Integrity Motors LLC withdraw from the company as a member effective immediately. This form is to be added to the current operating agreement." Exhibit 6. Consistent with Exhibits 2 and 6, Silvonen filed a document entitled "Articles of Amendment for Domestic Limited Liability Company" with the State of Montana on October 20, 2008, giving notice of the following change in ownership: "Walker withdraws from company." Silvonen concedes that Hunter did not know about either Exhibits 2 or 6, explaining at trial that he did not tell Hunter about the change in ownership because Hunter never asked. Hunter testified that he considered Walker a friend, but had just met Silvonen. Thus, if Hunter would have known that Walker had only a 5% ownership interest in Integrity Motors, he would not have invested his $100,000.

As indicated above, Exhibit 2 contemplated an initial contribution of sweat equity by Walker and an initial contribution to Integrity Motors of $150,000 by Silvonen. Contrary to Exhibit 2, Silvonen testified that he and Walker always intended to each contribute $35,000 to Integrity Motors. Silvonen testified that he and Walker hoped to secure their initial contributions from family and friends.

Silvonen testified that he contributed a lot more than $35,000 to Integrity Motors. Silvonen testified that Walker also contributed $40,000 to Integrity Motors. According to

8

Silvonen, Walker obtained $40,000 from a friend identified as Peggy.  The $40,000 was deposited into Integrity Motors checking account on August 27, 2008.  Silvonen explained, however, that Integrity Motors had to repay Peggy her $40,000 in the fall of 2008 because Peggy wanted her money back and Silvonen and Walker did not want Peggy running around "saying Integrity Motors stole $40,000 from her."  Silvonen acknowledged that Hunter was not aware of the short-term financing from Peggy until approximately the summer of 2009.

In addition to the short-term financing from Peggy, Exhibit 5 is an undated authority addendum signed by Silvonen and Walker wherein the two agreed "to setup Integrity Motors LLC with First Interstate Bank indirect.  Brad Silvonen and Jeff Walker mutually agree to do business with First Interstate Bank indirect and to abide by dealer agreement."  Silvonen testified that the original floor plan financing applications were submitted in July 2008 when Silvonen and Walker were still working at Blue Star.  Hunter had no knowledge of the authority addendum or the fact that Silvonen and Walker were seeking to secure financing above and beyond that supplied by Hunter.

In an attempt to reconcile the two operating agreements, Silvonen testified that because Walker was on the dealer license and was part of Integrity Motors, financing company's required that both Silvonen and Walker provide personal financial information.  Walker signed on September 9, 2008, the dealer information sheet at Exhibit 30.  However, Walker's credit presented a problem for Integrity Motors because Walker had previously filed bankruptcy.  Silvonen testified that Walker's interest in Integrity Motors was reduced from 50% to 5% so Integrity Motors could secure additional financing.

Silvonen also testified that Integrity Motors did indeed buy cars with Hunter's money, but

Hunter's security interest was not perfected because Silvonen did not know, even though he had

been in the car business for numerous years, how to perfect a security interest in a car.  Silvonen

later testified that they could not have perfected Hunter's security interest in the vehicles because

it would have slowed Integrity Motors' sales process too much.  Silvonen's later testimony

suggests he knew how to perfect Hunter's security interest but elected not to do so.

Silvonen estimated that Integrity Motors incurred expenses of roughly $14,000 to

$15,000 between early July 2008 and late August 2008.  The evidence does not support

Silvonen's estimation of expenses and Silvonen offered no evidence regarding vehicles that were

purchased with Hunter's money.

Prior to starting Integrity Motors, Silvonen also owned and operated Big Sky Financial

Group, Inc. ("Big Sky").  On July 17, 2008, Big Sky's checking account at Valley Bank had a

negative balance of $18,582.80.  On July 18, 2008, Silvonen transferred $20,000 of Hunter's

initial $50,000 investment in Integrity Motors to Big Sky's account so that Big Sky's account had

a positive balance of $1,417.20.  Between July 22, 2008 and July 31, 2008, Silvonen transferred

an additional $1,600 from Integrity Motors' checking account to Big Sky's checking account.

Silvonen testified that he was paying Integrity Motors' bills through Big Sky's checking account.

However, Silvonen could not identify any charges from the Big Sky account that were

attributable to Integrity Motors.  The Court would note that check number 1138 payable to the

Secretary of State in the amount of $170.00 and dated July 9, 2008, is most likely an Integrity

Motors' expense.  However, the bulk of the remaining checks written on Big Sky's account

cannot logically be attributable to Integrity Motors.  For example, many of the checks are made

payable to Silvonen or his spouse, Carissa Silvonen ("Carissa"), while other charges include

Silvonen's personal mortgage payment, a payment to GMAC, golf, and McDonald's. Between August 1, 2008, and August 27, 2008, when Peggy loaned $40,000 to Walker/Integrity Motors, Silvonen transferred an additional $3,350 from Integrity Motors to Big Sky. Between August 27, 2008 and December 31, 2008, Silvonen would transfer an additional $14,500 from Integrity Motors to Big Sky. Giving Big Sky credit for the $170 payment to the State of Montana, Silvonen transferred $39,280 from Integrity Motors to Big Sky between July 18, 2008, and December 31, 2008.

In addition to the above transfers, Silvonen, who was in sole control of Integrity Motors' finances, wrote a check for $1,500 to Carissa in July of 2008. In August of 2008, Silvonen wrote checks totaling $13,200 to Carissa. Silvonen also paid Dick and Cindy Silvonen $500.00 in August of 2008. In September of 2008, Silvonen paid Carissa a total of $8,700 and paid Dick and Cindy Silvonen $3,000. Similarly, in October of 2008, Silvonen paid Carissa $12,800 and paid Dick Silvonen $500.00. In November 2008, Silvonen paid Carissa $25,900. The Court cannot read all the checks written in December of 2008 but would note that Integrity Motors' checking account had a negative balance as of January 8, 2009. In all, it appears Silvonen transferred approximately $66,100 to Carissa and other family members between late July 2008 and December 31, 2008. *See also* Exhibit 25.

Silvonen contends that he did not have a checking account so he wrote checks to Carissa rather than himself. Silvonen also contends that while he took funds in excess of $62,000 out of Integrity Motors, Carissa repaid the majority of those funds. Exhibit 26 shows checks from Carissa's account at American Federal Savings Bank totaling $71,100 that Carissa allegedly paid back to Integrity Motors. However, Walker's Exhibit 4 reflects that check number 3092 in the

11

amount of $2,750 and check number 3094 in the amount of $2,400 were returned for insufficient funds.  Silvonen also failed to adequately explain how payments totaling $6,100 to Capital One provided a benefit to Integrity Motors.  Therefore, the balance on Exhibit 26 is properly reduced to $59,850.

Exhibit 38 is list of various checks drawn on Integrity Motors' checking account.  Exhibit 38 shows three payments totaling $53,600 made to Patricia Arms, Silvonen's grandmother.  Of the payments made to Patricia Arms, one in the amount of $25,600 was returned for insufficient funds.  Consequently, it appears Silvonen made payments of $28,000 to his grandmother in 2009.

Exhibit 37 shows payments to Walker between August 19, 2008, and May 30, 2009, totaling $43,100, which amount included a payment of $10,000 to Walker on August 19, 2008.  As Silvonen explained, Walker put Peggy's $40,000 in Integrity Motors and Silvonen in turn paid Walker $10,000.  Silvonen testified that he paid this amount to Walker so Walker "could get his mind right" without having to worry about financial problems.

In addition to paying Carissa, Walker and other family members, Silvonen also wrote checks to himself.  For example, exhibit 27 shows that Silvonen wrote himself a check in the amount of $4,500 on April 22, 2009.  Silvonen also wrote numerous checks to cash.  Exhibit 28 is a summary of checks written to cash, showing that between November 20, 2008, and September 16, 2009, Silvonen received cash totaling $72,600.  Of the aforementioned amount, Silvonen testified that $21,100 was used for customer loan payoffs.  On June 11, 2009 and August 8, 2009, Silvonen used $9,200 of the cash to pay his personal mortgage.  Silvonen could not explain the majority of the other cash withdrawals, but admitted that $17,600 of the cash withdrawals went directly to himself.  Silvonen contends that he wrote a check to cash on August

12

3, 2009, and that $10,400 went to Hunter, $3,000 was paid to a customer and $2,500 went back into the bank account.  Hunter disputes that he received a cash payment of $10,400 from Silvonen.

Silvonen was also unable to explain how various charges reflected in Integrity Motors' bank statements benefitted Integrity Motors.  For instance, Silvonen had no explanation for a charge of $381.15 to Macy's on October 6, 2008, online payments of at least $1,350.00 to Bank of America made December 3, 2008, and August 26, 2009, a $397.00 charge to Biotech Research on January 12, 2009, or numerous charges to "Canyon Ferry Mini" and "Gabes Conv." Similarly, Silvonen admitted that payments made to "Mt. Interventional Diag., Rocky Mountain Eye, Anesthesia Associates, Women's Health Center, Helena Lab. Physicians and L & C Emergency Phys." totaling $492.31 had nothing to do with Integrity Motors, even though such amounts were paid with Integrity Motors' funds.  While Silvonen could not explain numerous of the charges on the bank statements, Silvonen conceded that he was the sole person in charge of Integrity Motor's finances.

Hunter had no check writing authority for Integrity Motors and was not involved in any of its business affairs.  Exhibit 31 is document titled "Monthly Payroll Register, Integrity Motors, July 2008-April 2009."  Exhibit 31 shows payments to Silvonen, Walker and Hunter.  Hunter was not an employee of Integrity Motors and thus did not receive a paycheck from Integrity Motors.  Exhibit 31 should probably be labeled a monthly draw register.  Silvonen testified that he did not prepare Exhibit 31, but thought perhaps Walker had prepared Exhibit 31.  Exhibit 31 purports to show that Silvonen received $149,133.69 from Integrity Motors, Walker received $41,600 and Hunter received $19,237.50.

13

Silvonen agreed that he probably paid Walker $41,600 between July 2008 and April 2009, as reflected in Exhibit 31.  Silvonen also agreed that he paid Hunter $19,237.50 during that same period.  Silvonen contends, however, that Hunter received an additional $10,400 that is not reflected on Exhibit 31.  As noted earlier, Silvonen offered no proof of such payment.  While agreeing with the amounts shown for Walker and Hunter on Exhibit 31, Silvonen disagreed that he took $149,133.69 out of Integrity Motors between July 2008 and April 2009.

Integrity Motors eventually went out of business when it had no cars left to sell.  Exhibit 1 reflects that Integrity Motors was organized with the Montana Secretary of State on July 9, 2008.  Integrity Motors began selling cars on or about August 5, 2008, the date it secured its dealer license.  Integrity Motors was dissolved on December 1, 2009.

When Hunter was asked by Silvonen's counsel how he expected Silvonen and Walker to pay their ongoing bills and fixed overhead expenses, such as rent and the refurbishing of cars at the start, Hunter explained that Silvonen and Walker were each to have contributed $35,000 to Integrity Motors, leaving $70,000 to cover monthly operating expenses.  Hunter explained that he required the personal investment by Silvonen and Walker in order that the  business to be financially viable.  Integrity Motors, however, was not financially viable because, as Silvonen admitted during his testimony, "we paid ourselves too much money."

Based upon the facts above, Hunter requests that the sum of $134,600 be excepted from Silvonen's discharge under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4).  Silvonen disputes Hunter's claim and requests that Hunter's debt be discharged in this case.  Walker's complaint, which appears to be in the nature of a contribution claim, seeks a determination under an unspecified subsection of 11 U.S.C. § 523 that any damages Walker might sustain as a result of a possible

14

future judgment by Hunter against Walker be declared a nondischargeable obligation of Silvonen.

## APPLICABLE LAW

It is well-settled that the Bankruptcy Code's central purpose is to provide a fresh start to the honest but unfortunate debtor. *See Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).  However, under certain circumstances, a creditor may seek to except from a debtor's discharge certain debts.  *See* 11 U.S.C. §§ 523(a).  However, "[i]n order to avoid unjustifiably impairing a debtor's fresh start," exceptions to discharge under § 523 are to be narrowly construed.  *Ghomeshi v. Sabban (In re Sabban),* 600 F.3d 12919, 1222 (9th Cir. 2010). *See also, Snoke v. Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir. 1992).

### 11 U.S.C. § 523(a)(2)(A)

"Section 523(a)(2)(A) provides that, 'A discharge under ... this title does not discharge an individual debtor from any debt—(2) for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.'  To prevail on a claim under § 523(a)(2)(A), a creditor must demonstrate five elements: '(1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.'" In re Weinberg, 410 B.R 19, 35 (9th Cir. BAP 2009), quoting *Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman)*, 234 F.3d 1081, 1085 (9th Cir.2000) citing *Am. Express Travel Related Servs. Co. v.*

15

*Hashemi (In re Hashemi)*, 104 F.3d 1122, 1125 (9th Cir.1996). *See also In re Sabban,* 600 F.3d at 1222; *Harmon v. Kobrin (In re Harmon)*, 250 F.3d 1240, 1246 (9th Cir. 2001*); Apte v. Japra, M.D., F.A.C.C., Inc. (In re Apte)*, 96 F.3d 1319, 1322 (9th Cir. 1996). "The creditor bears the burden of proof to establish all five of these elements by a preponderance of the evidence."  Id. (citing Slyman, 234 F.3d at 1085).  *See also Grogan v. Garner*, 498 U.S. at 287-88.

### 1.  Intent to Deceive

The first three elements of § 523(a)(2)(A), when taken together, establish the element of intent to deceive, which the creditor must establish by a preponderance of the evidence.  In other words, a creditor must establish that a debtor knowingly made a false representation, either express or implied, with the intent of deceiving the creditor.  In a two-party transaction, as distinguished from a three-party credit card transaction, the alleging party must prove the elements of misrepresentation and reliance directly and by a preponderance of the evidence and not by reference to the totality of the circumstances.  *Compare Turtle Rock Meadows Homeowners Assoc. v. Slyman (In re Slyman)*, 234 F.3d 1081, 1086 (9th Cir. 2000) *with Citibank (South Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1086 (9th Cir. 1996).  As to the remaining elements, a creditor sustains its burden of proof under § 523(a)(2)(A), if a Court, after considering the facts and circumstances of a particular case, answers the following two inquiries in the affirmative: 1) did the creditor justifiably rely on the debtor's representation–reliance; and 2) was the debt sought to be discharged proximately caused by the first two elements–causation.

### 2.  Reliance

A creditor must establish that it relied on the false representations made by the debtor.  *Field*, 116 S.Ct at 438 (1995).  Such reliance need not be reasonable, but it must be justifiable.

16

*Id*. As the Supreme Court held in *Field*, "a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Id*. at 444 (quoting § 540 RESTATEMENT (SECOND) OF TORTS (1976)). This standard depends upon the knowledge and experience of the person to whom the representations were made. As the Supreme Court in *Field* further explained:

> [A] person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses. Thus, a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses."

*Id*. (quoting § 541, Comment a., RESTATEMENT (SECOND) OF TORTS (1976)). Interpreting this standard, the Ninth Circuit Court of Appeals teaches: "Although one cannot close his eyes and blindly rely, mere negligence in failing to discover an intentional misrepresentation is no defense for fraud." *Apte*, 96 F.3d at 1322.

### 3. Causation

Finally, to prevail under 11 U.S.C. § 523(a)(2)(A), a creditor must establish that a claim sought to be discharged arose from an injury proximately resulting from his or her reliance on a representation that was made with the intent to deceive. *Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir. 1991). "Proximate cause is sometimes said to depend on whether the conduct has been so significant and important a cause that the defendant should be legally responsible." *Id*. at 604. Moreover, as the United States Supreme Court explained in *Field*, a court may turn to

17

the RESTATEMENT (SECOND) OF TORTS (1976), "the most widely accepted distillation of the common law of torts" for guidance on this issue. *Field*, 116 S.Ct. at 443.

The RESTATEMENT (SECOND) OF TORTS (1976) explains that proximate cause entails (1) causation in fact, which requires a defendant's misrepresentations to be a "substantial factor in determining the course of conduct that results in loss, § 546; and (2) legal causation, which requires a creditor's loss to "reasonably be expected to result from the reliance." § 548A. *See also In re Creta*, 271 B.R. 214, 220 (1ˢᵗ Cir. BAP 2002). In determining the presence of proximate cause, however, courts must refrain from relying on speculation to determine whether and to what extent a creditor would have suffered a loss absent fraud. *Siriani v. Northwestern Nat'l Ins. Co. of Milwaukee, Wisc. (In re Siriani),* 967 F.2d 302, 306 (9th Cir. 1992).

**11 U.S.C. § 523(a)(4) – Fiduciary Capacity**

Section 523(a)(4) provides that a " discharge under section 727 . . . does not discharge an individual debtor from any debt– . . . (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." In an action to except a debt from discharge under § 523(a)(4), three elements must be demonstrated: (1) the existence of an express trust, (2) the debt was caused by the debtor's fraud or defalcation, and (3) the debtor acted as a fiduciary to the creditor at the time the debt was created. *Otto v. Niles (In re Niles)*, 106 F.3d 1456, 1459 (9th Cir. 1997); *Jacks v. Jacks (In re Jacks)*, 266 B.R. 728, 735 (9th Cir. BAP 2001).

The meaning of "fiduciary" under § 523(a)(4) is a matter of federal law. *Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir. 1986). Thus, for purposes of § 523(a)(4), the debtor must have been a trustee through an express or technical trust imposed before and without reference to the wrongdoing that caused the debt. *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1185 (9th Cir.

18

1996). A technical trust created by statute and/or case law will suffice, provided that the law (1) defines the trust res, (2) identifies the fiduciary's asset management duties, and (3) imposes obligations on the fiduciary prior to the alleged wrongdoing. *See Blyler v. Hemmeter (In re Hemmeter)*, 242 F.3d 1186, 1190 (9th Cir. 2001). The broad definition of fiduciary – a relationship involving confidence, trust and good faith – is inapplicable in the dischargeability context. *Ragsdale v. Haller*, 780 F.2d at 796.

Establishing an express trust in Montana is straightforward and requires four elements: (1) intent to create a trust; (2) the existence of trust property; (3) designation of beneficiaries; and (4) compliance with the statute of frauds. MONT. CODE ANN. ("MCA") §§ 72-33-202, 203, 206, 208. As to the second element of § 523(a)(4), "[d]efalcation is defined as the 'misappropriation of trust funds or money held in any fiduciary capacity; [the] failure to account for such funds.'" *In re Bigelow*, 271 B.R. 178, 186 (9th Cir. BAP 2001), quoting *Lewis v. Scott*, 97 F.3d 1182, 1186 (9th Cir. 1996).

As recently discussed at length by the Bankruptcy Court in Idaho:

> To examine the nature of the relationship between LLC members the Court first looks to the applicable statutory framework. Section 53–622 of the Idaho Limited Liability Company Act, Idaho Code §§ 53–601 to –672 (2009) (the "Act"), provides:
>
> > Every member and manager must account to the limited liability company and hold as trustee for it any profit or benefit derived by that person without the consent of more than one-half ( ½ ) by number of the disinterested managers or members, or other persons participating in the management of the business or affairs of the limited liability company, from:
> >
> > > (a) Any transaction connected with the conduct or winding up of the limited liability company; or

19

(b) Any use by the member or manager of its property, including, but not limited to, confidential or proprietary information of the limited liability company or other matters entrusted to the person as a result of his status as manager or member.

Idaho Code § 53–622(2) (2009) (emphasis added).

The Ninth Circuit considered language similar to that contained in Idaho Code § 53–622(2) in *Ragsdale,* a case in which the court was tasked with determining whether, under California law, partners acted in a fiduciary capacity toward each other for purposes of § 523(a)(4). 780 F.2d at 795–97. The provision at issue there, Cal. Corp.Code § 15021 (1977), provided:

Every partner must account *to the partnership* for any benefit, *and hold as trustee for it* any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property.

*Id.* at 796 (emphasis added).  *Ragsdale* concluded that the California code provision did not establish the fiduciary relationship required by § 523(a)(4), noting that the statute created a trust only when a partner derived profits without consent of the partnership; just the sort of trust *ex maleficio* that courts, including the United States Supreme Court, had found to be outside the purview of § 523(a)(4). *Id.*  (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *Teichman*, 774 F.2d at 1399)).

However, the *Ragsdale* court went on to find that California case law had made all partners trustees over the assets of the partnership, thereby elevating the duties of partners beyond those required by the literal wording of the statute. Relying on these state court decisions, the panel held that in California partners were fiduciaries within the meaning of § 523(a)(4). *Id*. at 796–97; *see also Lewis*, 97 F.3d at 1185–86 (concluding Arizona law rendered partners trustees for purposes of § 523(a)(4)); *Lewis v. Short (In re Short)*, 818 F.2d 693, 695 (9th Cir.1987) (reaching the same conclusion applying Washington law).

*Ragsdale* and its progeny are instructive here. Although those decisions preclude the Court from holding that the language of Idaho Code § 53–622(2) creates the type of express trust required by § 523(a)(4), if Idaho case law has expanded the duties of LLC members to make them trustees over LLC assets, those members may qualify as fiduciaries under § 523(a)(4).  *See Streibick v. Murrell (In re Murrell)*, 04.3 I.B.C.R. 122, 126 (Bankr. D.Idaho 2004) (turning to state case law to determine whether corporate officers and directors were fiduciaries in the absence of an express agreement or statutorily-created trust)

20

(citing *Cantrell*, 329 F.3d at 1126–28).

      The Idaho Supreme Court has only recently considered the issue of fiduciary duties between LLC members. *See Bushi v. Sage Health Care, PLLC*, 146 Idaho 764, 203 P.3d 694, 699–700 (Idaho 2009). While finding that the Act did not expressly list any such duties, the court in *Bushi* concluded that LLC members did owe one another the fiduciary duties of trust and loyalty. *Id.* at 699. However, *Bushi* did not go so far as to deem LLC members to be trustees over LLC assets. Absent such a pronouncement, this Court declines to find Idaho LLC members are fiduciaries within the narrow meaning of § 523(a)(4). *See Ragsdale*, 780 F.2d at 796 ("The broad, general definition of fiduciary—a relationship involving confidence, trust and good faith—is inapplicable in the dischargeability context."); *Honkanen*, 446 B.R. at ——, 2011 WL 781831, at *3 ("The mere fact that state law puts two parties in a fiduciary-like relationship does not necessarily mean it is a fiduciary relationship within 11 U.S.C. § 523(a)(4)."). Accordingly, the Court concludes that Recyclers, Debtors' closely-held entity, was not acting in a fiduciary capacity with respect to Murray, its fellow LLC member.

*In re Woodman*, — B.R. —, 2011 WL 1100264, at *4-5 (Bankr. D. Idaho 2011).

## DISCUSSION

      A creditor had a weighty burden under § 523(a)(2)(A) to show that a debtor knowingly made a false representation, either express or implied, with the intent of deceiving the creditor. The Court finds that Hunter has sustained his weighty burden by showing Silvonen made four separate false representations that would each justify excepting $134,600 from Silvonen's discharge.

      First, Silvonen assured Hunter that his money would be used solely to purchase vehicles for Integrity Motors. Integrity Motors' bank statement for July of 2008 shows Hunter's $50,000 as the only money deposited that month. From that $50,000, Silvonen transferred $21,600 to Big Sky, paid $1,500 to Carissa, paid rent of $2,750, paid Farmers Insurance $1,012, paid the City of Helena $12.50, paid the State of Montana $105.00, and ordered checks costing $138.00, leaving an ending balance in Integrity Motors' checking account on July 31, 2008, of $22,882.50.

21

Silvonen clearly used $27,117.50 of Hunter's initial investment for something other than purchasing cars.

Similarly, Integrity Motor's August 2008 bank statement reflects that by the time Hunter invested his second $50,000 on August 19, 2008, Silvonen had transferred another $2,250 to Big Sky, had paid Carissa another $5,700 and paid other miscellaneous items totaling $1,506.67. Silvonen clearly did not use Hunter's $100,000 investment to purchase cars, as he assured Hunter he would do.

Second, Silvonen representation to Hunter that Hunter would be Integrity Motor's sole source of financing was false and misleading. Silvonen conceded at trial that he was seeking additional financing from other sources on behalf of Integrity Motors while still employed at Blue Star Auto. Silvonen also conceded that he caused Integrity Motors to secure floor plan financing from other lenders, despite his prior representations to Hunter that Hunter would be Integrity Motor's sole source of financing.

Third, Silvonen assured Hunter that his investment would be secured by vehicles having a value of at least $144,000. Silvonen never took the steps necessary to secure Hunter's investment but more importantly, Silvonen bought and sold cars in such a way that by the summer of 2009, Integrity Motors had only a few cars, with a combined value of $1,000, that were not financed by other secured lenders. Even though Silvonen agreed both verbally and in writing in the Addendum at Exhibit 4 that Hunter's investment would be secured by Integrity Motor's inventory, reality shows that Integrity Motor's had virtually no unencumbered inventory to protect Hunter's investment. In other words, the evidence shows Hunter's investment was not secured and in addition, Hunter's investment could not have been used to purchase cars.

22

Finally, Hunter wanted to make sure that Integrity Motors was financially viable and that is why he required that Silvonen and Walker each make an initial investment in Integrity Motors of $35,000. Silvonen and Walker each agreed verbally and in writing to make the initial investment. As a result of Hunter's requirement, Silvonen prepared an operating agreement showing that Silvonen and Walker were 50/50 owners of Integrity Motors and that each was contributing $35,000 to Integrity Motors. Silvonen prepared and signed the operating agreement knowing that he was contributing nothing to Integrity Motors and knowing that he was a 95% owner of Integrity Motors and that Walker was only a 5% owner of Integrity Motors, as reflected in the second operating agreement signed by Walker and Silvonen.

Notwithstanding Silvonen's representations made verbally and in writing, the evidence shows that Silvonen did not make his initial investment and instead withdrew substantial sums from Integrity Motors. Silvonen attempted to explain that he put more money into Integrity Motors than he withdrew. The evidence shows otherwise.

In 2008, Silvonen transferred $39,280 from Integrity Motors to Big Sky. The Court does not see where that sum benefitted Integrity Motors or was ever repaid. Silvonen also paid Carissa and other relatives $66,100 in 2008. Of that amount, Silvonen could only show where $59,850 was repaid to Integrity Motors. Silvonen also wrote a check to himself in the amount of $4,500 and in addition, wrote checks to cash totaling $72,600. Silvonen explained that $21,100 of the amount written to cash was used for customer loan payoffs, but Silvonen had no plausible explanation as to what happened to the other $51,500. By this Court's calculation, Silvonen took in excess of $100,000 from Integrity Motors, and never made the initial contribution of $35,000.

Silvonen's representations as discussed above were material and Silvonen knew at the

23

time he made the represenations that they were false.  Furthermore, Silvonen made his false statements and representations with intent that Hunter be deceived because, as Hunter testified, he would never have agreed to invest his money in Integrity Motors had he known Silvonen and Walker were seeking financing from other lenders, that each was not contributing $35,000 to Integrity Motors, that his investment would not be used solely to purchase autos, or that Silvonen and Walker were not equal owners of Intergity Motors.  Hunter reasonably relied upon Silvonen's false statements and as a result, Hunter was proximately damaged by Silvonen's misstatements.  Therefore, this Court finds that Hunter is entitled to his requested judgment under 11 U.S.C. § 523(a)(2)(A).

Hunter does not allege the existence of either an express or a technical trust in support of his § 523(a)(4) claim, but instead, appears to summarily assert that Silvonen was a fiduciary because Silvonen had a position of superiority over Hunter.  Hunter does not cite to a statute or case law that would elevate Silvonen's relationship with Hunter to the status where trust-type obligations are imposed.  Given the weighty burden imposed upon creditors under § 523, this Court declines to consider Hunter's claim under § 523(a)(4) where Hunter failed to plead one of the specific requirements of said statute.

Also pending in this consolidated proceeding is Walker's § 523 claim of nondischargeability against Silvonen.  Walker apparently seeks to except from Silvonen's discharge any judgment that Hunter may at some future date secure against Walker stemming from the Integrity Motors fiasco.  As Walker's complaint is framed, Silvonen can have no liability to Walker unless and until Hunter secures a judgment against Walker.  Until that time, Walker cannot assert a contribution claim against Silvonen.

24

As mentioned earlier, exceptions to discharge under § 523 are narrowly construed. Walker has failed to satisfy his weighty burden in this case.  In accordance with the foregoing,

IT IS ORDERED that a separate judgment shall be entered in favor of Plaintiff Don Hunter and against the Debtor/Defendant, Bradly Jacob Silvonen; and the sum of $134,600 is excepted from Debtor Bradly Jacob Silvonen's discharge under 11 U.S.C. § 523(a)(2)(A).

IT IS FURTHER ORDERED that a separate judgment shall be entered in favor of the Debtor/Defendant, Bradly Jacob Silvonen; and Walker's complaint against the Debtor/Defendant is dismissed.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana